Filed 6/10/21  Richman v. Regents of the U. of Cal. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| DOUGLAS D. RICHMAN,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Appellant. | D076965<br>(Super. Ct. No. 37-2018-00010040-CU-MC-CTL)<br><br>AMENDED ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |


THE COURT:

It is ordered that the opinion filed on May 20, 2021 be modified as follows:

1. On page 2, at the end of the second full paragraph after the words " 'entitled to a total of 34.403 years of Service Credit,' " add the following sentence:

> The Regents appeal, asserting the court erred as a matter of law in interpreting the UCRP and, in any event, Richman's claims are time-barred.

2. On page 2, the third full paragraph that begins "The upshot of the judgment" is deleted in its entirety.

3. On page 2, the fourth sentence of the last paragraph beginning with "Contrary to," the word "university" is replaced with "University of California (UC)" so that the sentence reads:

> Contrary to the trial court's determination, on de novo review we conclude he was not an Eligible Employee because he lacked the requisite 50 percent or more University of California (UC) appointment during this period.

The respondent's petition for rehearing is denied.

There is no change in judgment.

O'ROURKE, Acting P. J.

Copies to:  All parties

2

Filed 6/9/21  Richman v. Regents of the U. of Cal. CA4/1 (prior 6/9/21 modification order)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| DOUGLAS D. RICHMAN,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>REGENTS OF THE UNIVERSITY<br>OF CALIFORNIA,<br><br>    Defendant and Appellant. | D076965<br>(Super. Ct. No. 37-2018-00010040-CU-MC-CTL)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on May 20, 2021 be modified as follows:

1.  On page 2, at the end of the second full paragraph after the words " 'entitled to a total of 34.403 years of Service Credit,' " add the following sentence:

> The Regents appeal, asserting the court erred as a matter of law in interpreting the UCRP and, in any event, Richman's claims are time-barred.

2. On page 2, the third full paragraph that begins "The upshot of the judgment" is deleted in its entirety.

3. On page 2, the fourth sentence of the last paragraph beginning with "Contrary to," the word "university" is replaced with "University of California (UC)" so that the sentence reads:

> Contrary to the trial court's determination, on de novo review we conclude he was not an Eligible Employee because he lacked the requisite 50 percent or more University of California (UC) appointment during this period.

The appellant's petition for rehearing is denied.

There is no change in judgment.

O'ROURKE, Acting P. J.

Copies to: All parties

2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| DOUGLAS D. RICHMAN,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Appellant. | D076965<br><br><br>(Super. Ct. No. 37-2018-00010040-CU-MC-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County, Ronald F. Frazier, Judge.  Reversed with directions.  Request for judicial notice denied.

Reed Smith and Raymond A. Cardozo for Defendant and Appellant.

Law Office of Michael A. Conger and Michael A. Conger for Plaintiff and Respondent.

For over 42 years, Douglas D. Richman, M.D. worked under a joint appointment as a Veterans Administration San Diego Healthcare System (VA) staff physician and also a member of the faculty at the University of California San Diego School of Medicine (UCSD). At retirement he received a VA pension based on 47 years of service credit, plus a University of California Retirement Plan (UCRP) pension based on 14.22 years of service credit.[1]

In this declaratory relief action against the Regents of the University of California (Regents), Richman asserted he was entitled to an additional 20 years of UCRP service credit. After a bench trial, the superior court agreed and entered a judgment that Richman is "entitled to a total of 34.403 years of Service Credit."

The upshot of the judgment is that between the VA and the University of California (UC), Richman has 76.5 years of service credit for 42.5 years of employment. The Regents appeal, asserting the court erred as a matter of law in interpreting the UCRP and, in any event, Richman's claims are time-barred.

As we explain, the case is best analyzed in two parts. Part 1 involves the period from July 1976 (Richmond's date of hire) to 1992, when a UCRP policy change with respect to faculty like Richman—holding a joint VA and UC appointment—became effective. The primary issue for this period is whether Richman qualified as an "Eligible Employee" under the UCRP. Contrary to the trial court's determination, on de novo review we conclude he was not an Eligible Employee because he lacked the requisite 50 percent or more university appointment during this period.

---

[1] Unless otherwise specified, all references to the UCRP are to the April 1976 version.

Part 2 involves the period from 1992 to 2019. Eligibility is not in issue. Rather, the question is whether Richman earned "Covered Compensation" and if so, the amount each year. The trial court interpreted the UCRP to provide that *all* of Richman's university compensation was Covered Compensation. Again, on de novo review we conclude otherwise.

Accordingly, we will reverse the judgment with directions to enter judgment in favor of the Regents, making it unnecessary to consider whether Richman's claims are time-barred.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Richman's Joint VA and UC Appointments*

The VA hospital is located on UCSD property. Beginning in the mid-1970's, the VA and UCSD embarked on something akin to a joint venture. The VA paid the salary of some UCSD medical school faculty. That faculty, in turn, provided patient care at the VA hospital, and used that clinical setting to train medical students. This became a nationwide "model" for cooperation between the VA and a medical school, what one witness characterized as a "win/win for both."

In June 1976, UCSD medical school had two open faculty positions. One was designated a "VA slot"; the other, a "university slot." Richman was then working in Boston, completing his training in infectious diseases. He had previously worked as a U.S. public health officer, where he accrued civil service retirement service credit. UC successfully recruited him and placed him in the VA slot.

Richman's joint VA/UC appointment is memorialized in two documents. The first, dated June 7, 1976, is from the VA—a "full time appointment" as a VA "staff physician, Laboratory Services" with an annual $31,309 salary at "Chief Grade, Step 1." The second, issued a week later, is from UCSD—an

3

appointment as "Assistant Professor of Pathology and Medicine *in Residence*" and "member of the faculty of the School of Medicine." (Italics added in first quote.) The UC appointment was "concurrent with [the] appointment at the Veterans Administration Hospital at Chief Grade 1."

Richman did not know what "in Residence," meant—but he asked. He was told that "in residence" means his "primary salary" would come from a source other than state funds. In Richman's case, initially that source was the VA.[2] But by the early 1980's, "every penny of [his] university salary" came from the National Institutes of Health (NIH) grants that Richman generated.

Throughout his 42 years as a faculty member, Richman's salary was never paid using state funds. But that did not affect his opportunities for advancement. Apart from the funding source for salary, the criteria for appointment and advancement are the same for "in residence" faculty as for "ladder rank or tenured track."

B. *The UCSD Clinical Department Compensation Plan*

In 1972, the Regents adopted a Clinical Departments Compensation and Incentive plan (Compensation Plan) for UCSD medical school faculty. Participation in the Compensation Plan was "mandatory for all eligible faculty." Eligible faculty included those, like Richman, who had patient-care responsibility at an "affiliated hospital" (such as the VA) and who concurrently held a faculty appointment. Thus, Richman was in the Compensation Plan throughout his UC employment.

---

[2] The record is a bit unclear about the mechanics of this arrangement. There is some evidence that at least initially, the VA transferred funds to the university, which in turn used those funds to pay Richman.

4

As summarized in the table below, the Compensation Plan is comprised of three distinct components: (1) base salary, which the university designates "X"; (2) additional compensation, "Y"; and (3) incentive compensation, "Z."

| Designation | Type of Compensation |
|---|---|
| X | **Base salary** for teaching and university service. The amount is set by academic rank (e.g., "assistant professor") and step (e.g., "Step II") and applies across the UC system. |
| Y | **Additional salary.** A negotiated salary component based upon money the faculty member generates through, for example, grants. |
| Z | **Incentive compensation.** Income generated by physician-faculty members, usually from treating patients. Faculty who are not "clinically active" cannot earn Z. |

In 1992, an additional compensation category was added, designated X Prime (X′), which is a multiplier of X and results in additional base salary. In 1996, another multiplier was added, designated Y Prime (Y′).

To resolve this case it is unnecessary to explore the complexities arising from this type of compensation system—one that Richman characterizes as "Byzantine." Rather, the appeal turns on answering these questions:

(1) which of these compensation elements did Richman receive;

(2) when did he receive them; and

(3) which of these, if any, are "Covered Compensation" within the meaning of the UCRP.

But before answering these questions, a further discussion of Richman's joint VA/UC appointment is necessary to place these issues in fuller context.

5

C. *Richman's 1976 UC Appointment*

Richman's 1976 UCSD appointment letter states he would be "salaried 100% time by the Veterans Administration" and may also earn Z compensation as described in the Compensation Plan. According to the letter, the Compensation Plan was enclosed, but Richman testified he did not recall receiving it. In any event, whether enclosed or not, he never looked at it and claimed he "didn't know what base salary was."

The UC appointment letter says nothing about university-funded base salary (X compensation). The only type of university compensation mentioned is Z (i.e., clinical income).

At the time, Richman did not know what Z compensation was, and he did not ask. He knew he would be getting "a VA base salary," and it never "crossed [his] mind" that he would not be receiving a university base salary. Richman explained, "I hate to sound naïve, but I was just happy to be doing what I wanted to do and didn't ask questions about retirement or compensation."[3]

Richman's UC appointment letter also says nothing about the UCRP. Nor did anyone associated with the university discuss retirement with him. During interviews, Richman was told he would be eligible for a VA pension and receive "the same benefits and privileges of any faculty member at the university." According to Richman, it was not until 2011 that "people started getting informed" about the UCRP.

---

[3] From 1976 to about 1980, Richman received Z compensation. He testified that by the early 1980's, he no longer received Z income and "all" of his UC compensation came from NIH grants.

6

As will be evident, the extent of Richman's UC appointment, expressed as a percentage, determines UCRP eligibility. His UCSD appointment letter does not refer to any percentage with respect to the university. The only percentage stated is for the VA—at 100 percent.

For faculty holding joint VA/UC appointments, the university designates the extent of the VA appointment as a fraction. The denominator is always eight—presumably representing eight hours of an ordinary working day. For example, a 50 percent VA appointment is considered a four-eighths VA appointment. Richman's 100 percent VA appointment was designated eight-eighths. He held this eight-eighths VA appointment continuously throughout his 42-year career.

D. *The UCRP*

The parties stipulated that the April 1976 version of the UCRP, also called the Standing Order, was in effect at the time of Richman's hire. Because it is promulgated by the Regents, it has the force and effect of a statute. Under the UCRP, only plan "Members" who have "Credited Service" receive retirement benefits. Each of these terms is further described below.

1. *Eligible Employee*

To be a plan "Member," a UC employee must be an "Eligible Employee." Paragraph 2.15(i) of the UCRP (hereafter, Paragraph 2.15(i)) defines "Eligible Employee" as an employee of the Regents or university who "[i]s *appointed to work 50% time or* more" for a specified time period. (Italics added in second quote.)

Once a person becomes an Eligible Employee, "he [or she] shall continue to be a Member notwithstanding any change in the nature of his [or her] appointment unless there is a Break in Service." In other words, "once in the retirement system, you are always in it."

2. *"Covered Compensation"*

An Eligible Employee earns "Credited Service" only from "Covered Compensation." "Covered Compensation" is "the total monthly remuneration which a Member receives from the University for his [or her] regular and normal appointment" but excludes "[r]emuneration which exceeds 100% of the salary . . . for the position to which a Member has been appointed."

E. *Richman's UCSD Appointment, 1976–1992*

Gregory Ricks is employed in the university's Retirement Administration Service Center. He testified that prior to 1992, UCSD medical school faculty with joint VA/UC appointments could have a maximum total appointment between the two institutions of 100 percent. For example, a faculty member with a five-eighths VA appointment would by definition have a three-eighths university appointment.

Because Richman had an eight-eighths, or 100 percent VA appointment—for the period 1976 to 1992—the university determined he necessarily had a zero percent university appointment. As a result, the Regents concluded Richman was not an "Eligible Employee" under Paragraph 2.15(i), and earned no service credit for this period.

This determination is reflected in UC payroll forms. For example, a 1977 "personnel action form," an excerpt of which is copied below, states "VA appt: Chief Grade Step I, 8/8 time." It also indicates Richman may receive Z compensation "subj[ect] to avail[able] funds," but has no X compensation.



8

It is important to understand that for a UCSD medical school faculty member holding a joint VA appointment, the percentage of his or her UC appointment is an *accounting issue*—not a measure or reflection of the time the faculty member spends doing UC work. As noted, pre-1992 a faculty member holding a joint VA/UC appointment at three-eighths VA would *always* have a five-eighths (or 62.5 percent) UC appointment, regardless of his or her actual time spent doing university work. As explained by David Bailey, the former chair of Richman's pathology department:

> "[T]he appointment at the university could be zero percent time. . . . One is teaching, one is doing research at the university, and one can do that at zero percent time."

Richman's career well illustrates this distinction between percentage appointment and actual work hours. According to the university, pre-1992 Richman held a zero percent UC appointment. Yet in the spring quarter of 1977, for example, he spent 137 hours teaching. In Winter 1979, that increased to 230 hours. Over two quarters in 1983, Richman spent 476 hours teaching as well as significant time in research. Richman testified that until 5 or 10 years before retirement, he worked approximately 80 hours per week, 60 of which was for the university.

Richman is "one of the most eminent scholars in the world." His UC work generated millions of dollars in grants for the university, and he made major contributions in the study and treatment of HIV/AIDS. He authored more than 700 articles and is an editor or coeditor of major textbooks. The university has recognized Richman for "extraordinary achievement" and "sustained excellence in teaching and service." In 2009, the university awarded him its highest academic rank, Distinguished Professor. If entitlement to UCRP benefits was based on hours worked, professional accolades, and outstanding achievement, this would be an easy case to affirm.

9

But under the UCRP, it is one's university *appointment*, not hours spent doing UC work and professional stature that determines eligibility. And only earnings that are "Covered Compensation" yield service credit.

The California Constitution grants the Regents broad powers to organize and govern the university, including the " 'paramount constitutional authority . . . to craft its employee benefits, regarding which [t]he Regents is entitled to independent value and deference from this Court.' " (*Jacobs v. Regents of the University of California* (2017) 13 Cal.App.5th 17, 24–25 (*Jacobs*).) Accordingly, as the parties stipulated, the UCRP has the force and effect of statute. (*Id.* at p. 21.) Our analysis is, therefore, governed by established principles of statutory interpretation, and not what we may believe Richman fairly deserves for his extraordinary work, or our views on the wisdom of the UCRP as applied to him. (*PGA West Residential Assn., Inc. v. Hulven Internat., Inc.* (2017) 14 Cal.App.5th 156, 188, fn. 26 [whether the policy behind a statute " 'is desirable or wise is not our duty to decide; our role is to construe the statute as enacted"].)

Contrary to the Regents position that he held a zero percent UC appointment from 1976 to 1992, Richman asserts that starting in 1976 he held a 100 percent *university* appointment. He bases this contention mostly on documents in his UC personnel file indicating "100% time." He asserted these documents "could fairly be interpreted to say that [his] UC academic appointment . . . is for 100 percent of the time." One of these documents is copied below, and more are contained later in this opinion:

10

ACADEMIC RECOMMENDATION SUMMARY FOR: __Promotion   X Merit    __Reappointment
                                      __Above Scale  __Appraisal  __Recall

FROM:  DEPARTMENT ___Pathology/Medicine___   COLLEGE School of Medicine___

                                      NAME RICHMAN_____ Douglas____ D.____
                                           Last (in caps)    First    Initial

Present Status                        Proposed Status

Rank & Step_Professor of Pathology and_  Rank & Step_Professor of Pathology and Medicine_
Medicine In Residence, Step I                   In Residence, Step III
Salary _<A.800(VA) Percent of Time_100%  Salary 67,600> (VA)___ Percent of Time _100%___
                                              (1/90 scale)
Basis:  9-mo._____  11-mo._X____      Basis:  9-mo._____   11-mo.x____

Years at Rank _2___  Step_2___        Effective Date_July 1, 1990-June 30, 1993____

Signature _Dawn M. Bailey_____ _____  Date_13 December 1989__
                                              3/14/90
        (Department/Division Chairman/Director)

_____

U. C. Academic Employment:

| Period | Title | Step | Percent Time | Department | |
|---|---|---|---|---|---|
| 7/1/76-6/30/78 | Assistant Professor IR | II | 100% | Pathology & Medicine | (VA) |
| 7/1/78-6/30/80 | Assistant Professor IR | III | " | " | " |
| 7/1/80-6/30/82 | Assistant Professor IR | IV | " | " | " |
| 7/1/82-6/30/84 | Associate Professor IR | I | " | " | " |
| 7/1/84-6/30/86 | Associate Professor IR | II | " | " | " |
| 8/1/84-7/31/85 | Special Leave (67% salary) | | | | |
| 7/1/86-6/30/88 | Associate Professor IR | III | " | " | " |
| 7/1/88-6/30/90 | Professor IR | I | " | " | " |

F.      *The 1992 Policy Change*

In 1992, the university changed its policy to enable UCSD medical school faculty holding joint VA appointments—even those like Richman with 100 percent VA appointments—to become "Eligible Employees" under the UCRP. This is documented in a memorandum entitled, "Health Sciences Faculty With Split Appointments."

First, the memorandum summarizes the then-existing policy, under which a faculty member with a five-eighths or greater VA appointment is ineligible under the UCRP:

> "Membership in the [UCRP] requires an appointment of at least 50% time for a year or longer. Many . . . faculty hold joint appointments between the University . . . and affiliated hospitals, such as the Veterans' Administration (VA). *Historically, their University appointment percentage and their VA appointment would equal 100%. In most cases, the VA appointment was 5/8 time or greater, by*

11

*definition making the University appointment 3/8 time* [*or less*]. *Therefore, many UC/VA joint appointees were not eligible for UCRP membership.*" (Italics added.)

Second, the memorandum recognizes that "this treatment created inequities":

> "For instance, it was possible for two [medical school] faculty members . . . earning similar pay, to be coded differently with respect to UCRP membership. The faculty member without the VA appointment could be a UCRP member if she/he held an appointment of 50% time or greater. *However, the other faculty member who had a joint UC/VA appointment would not be a UCRP member regardless of the amount of time actually worked at UC or the size of the salary, unless his/her VA appointment was 4/8 time or less.*" (Italics added.)

Third, the memorandum explains a change to remedy the inequity:

> "Given the unique arrangement of these split appointments, and to provide consistent treatment of employees, the following methodology has been approved: Regardless of the VA appointment, the UC appointment percentage will be determined by the ratio of UC-paid compensation to the full-time base professorial salary for the applicable rank and step. If the ratio is 50% or greater and the appointment is for a year or longer, then the faculty member will become a member of UCRP and earn service credit in proportion to the appointment percentage."

Ricks testified that under this 1992 policy, the university would "take the actual [university] pay of the individual, divided by the pay for the actual position, and come up with a . . . percentage, and then based on that percentage, if it's 50 percent or more, then that person would be eligible" under the UCRP. An example of how this works is contained in a 1992 letter authored by Ronald W. Brady, the university's senior vice president of administration, who wrote:

12

"[T]he following sets forth a simple example of policy.

"Published Professorial Grade 3 base salary = $50,000.

"If Professor X, Grade 3, is paid $25,000 by UC (which must be . . . coded as base compensation and remitted through UC payroll), Professor X is then considered '50% time' and is a UCRP member . . . .  UCRP service is credited proportionally at 50% . . . . *Income from other employers or 'Y' or 'Z' earnings do not comprise base compensation for benefit eligibility purposes and such income does not influence eligibility for UCRP.*"  (Italics added.)

"If Professor X UC-paid base salary subsequently drops to $12,500, UCRP service credit would then be prospectively calculated at 25%."

In 1998, this policy was "further refined" in guidelines that established a maximum 150 percent combined joint UC/VA appointment.  Bailey explained at trial, "So one could be 8/8ths or 100 percent VA and up to 50 percent of the university, or vice versa, 100 percent at the university and 50 percent at the VA."

As a result of this change, post-1992 Richman began participating in the UCRP, notwithstanding his 100 percent VA appointment.  In 2004, for example, Richman's X compensation was 50 percent of the full-time base salary ($315,000) for his position.  He was, therefore, an "Eligible Employee" under Paragraph 2.15(i).  This is reflected in this June 2004 university "salary proposal" he received showing a 50 percent university appointment together with an "8/8ths" or 100 percent VA appointment:[4]

---

[4]     As reflected in this document, Richman's "Gross UC Pay" of $165,396 is the sum of X (base salary) and X Prime.  Under the 1992 change in policy, only the X component (here, 50 percent of $315,570, or $157,785) is used in determining UCRP eligibility.

Summary of your salary distribution as of July 1, 2004:

Salary, Scale 3: 315,570 (X) @ 50%=     165,396  (X+XP)
                                        150,174  VA Pay
                                        315,570  Total Annual Compensation Package

              VA 8ths:      8/8th
         Percent of VA Time: 100%
             Total VA Pay:   150,174

    Percent PAID UC Time: 50.0%
          Gross UC Pay:   165,396

    Total Percent Time: 150.0%

After an audit in 2003, the university discovered that it failed to correctly implement this 1992 policy. The university retroactively credited Richman with an additional 5.807 service credits, representing a 50 percent UC appointment for the period 1992 to 2003. Based on the policy change allowing for up to 150 percent joint VA/UC appointments, ultimately the university credited Richman with 14.2177 service credits.[5]

G. *Litigation*

In 2015, a UCSD medical school faculty member contacted Richman stating, "we are looking for several poster children to 'test' the system and determine whether split-funded faculty (mainly based at the VA) are getting a fair shake." Richman stated, "I would be glad to serve as a poster boy." In 2018 Richman filed a superior court complaint containing a single cause of action for declaratory relief alleging "all years of his employment at the University should be included in his pension calculation." Richman had not

[5]     In his brief, Richman argues that the 1992 memorandum has "no impact on the rules" governing Richman's UC retirement benefits. If that were true, Richman would have zero service credits, not the 14.22 the Regents determine he had earned.

14

yet retired, but sought a judicial determination "regarding his entitlement to the UCRP pension . . . so that he can make retirement plans." While this litigation was pending, Richman retired and elected to receive a monthly $5,871.94 UCRP payment (net of taxes).

After a bench trial, the court issued a statement of decision. It determined that Richman's "initial appointment" as a UCSD assistant professor was "a one-hundred percent (100%) appointment" and that he "spent the vast majority of his career working for the University, not the Veteran's Administration." The court ruled that Richman became an Eligible Employee "upon the commencement of his employment on July 1, 1976" because the eligibility provisions "have nothing to do with whether an employee works elsewhere, such as at the VA."

The Regents introduced into evidence Richman's payroll records showing a distinction between his gross UC pay and amounts the Regents considered to be "Covered Compensation." For some years, the difference was substantial. For example, in 2018, Richman's gross UC pay was $246,189.12. But his Covered Compensation was $151,545.78.

Nevertheless, the trial court further determined that Richman's gross UC pay, as reflected in "his W-2 records of earnings from the University" constituted "Covered Compensation." In so holding, the trial court refused to apply the Compensation Plan (which states that only base salary is covered compensation), determining it created an irreconcilable conflict with the UCRP. It ultimately concluded, "Under the unambiguous provisions of the UCRP, Dr. Richman had a right to earn a pension from his first day of UCSD employment." Moreover, to the extent there was any "doubt," the court resolved it in Richman's favor on the grounds that pension laws are to be

15

liberally construed in favor of the pensioner and under Civil Code section 1654, ambiguities in a contract are resolved against the drafter.

After rejecting the Regents' statute-of-limitations and laches defenses, the court entered judgment determining that Richman is entitled to the UCRP pension based on all of his years of UCSD employment from July 1, 1976 to April 1, 2019—a total of 34.403 years of service credit.[6]

DISCUSSION

**Part 1:  1976 through 1992**

A.  *As a Matter of Law, Richman was Not an "Eligible Employee" Until 1992.*

"The Regents established the UCRP through its constitutional authority to do so.  As our Supreme Court has recognized:  'Article IX, section 9 [of the California Constitution], grants the [R]egents broad powers to organize and govern the university . . . .  " '[The] power of the Regents to operate, control, and administer the University is virtually exclusive.' " ' " (*Jacobs*, *supra*, 13 Cal.App.5th at p. 24.)  "The UCRP is the Regents' plan for certain employment benefits to University employees, including . . . retirement benefits.  Since the UCRP was adopted pursuant to the Regents' constitutional power, it has the force of statute."  (*Id.* at p. 21.)

Under Paragraph 2.15(i), an Eligible Employee is one who is "appointed to work 50% time or more" for a specified duration (e.g., for one year or longer). . Because there is no dispute that Richman's 1976 UC appointment was for more than one year, the eligibility question here turns on whether he met the 50 percent appointment criteria.

---

[6]    The court also determined that employee contributions should be deducted from the pension along with interest.

16

Focusing on the period 1976 to 1992, the Regents contend that as a matter of law Richman had a zero percent UC appointment. The argument is logical and straightforward:

1. In 1976, a faculty member holding a joint VA/UC appointment would have a total 100 percent appointment between the two entities.

2. Richman's had an eight-eighths, or 100 percent VA appointment, as documented in his appointment letter.

3. Therefore, Richman had a zero percent UC appointment.

Thus, the Regents argue, until the 1992 policy change allowing for up to a 150 percent VA/UC appointment, Richman was not an Eligible Employee under Paragraph 2.15(i). Moreover, that Richman actually worked a substantial amount of time for the university is, in the Regents' view, irrelevant under Paragraph 2.15(i) because eligibility is defined by his percentage of appointment, not time actually worked.

Because the UCRP has the force and effect of a statute, we independently review the trial court's interpretation of the relevant provisions. (See *Christensen v. Lightbourne* (2019) 7 Cal.5th 761, 771 [statutory interpretation is de novo review].) Paragraph 2.15 states:

> "Eligible Employee means an officer or employee of The Regents who:" [¶] . . . [¶]

> "(i) Is *appointed to work 50% time or more* on a fixed percent of time basis for an indefinite period, for a definite period of one year or longer, or for a shorter definite period with the reasonable prospect of renewal or extension by the Governing Board . . . ." (Italics added.)

" 'The fundamental purpose of statutory interpretation is to ascertain the intent' of the legislative body that adopted the enactment." (*Boshernitsan v. Bach* (2021) 61 Cal.App.5th 883, 892.) Here, the "legislative body" is the Regents. The plain meaning of the words themselves generally provides the

17

most reliable indicator of intent.  (See *Subaru of America, Inc. v. Putnam Automotive, Inc.* (2021) 60 Cal.App.5th 829, 836.)  "[E]ach word and phrase should be given significance" (*Kaplan v. Fairway Oaks Homeowners Ass'n* (2002) 98 Cal.App.4th 715, 719), and is presumed to " 'perform a useful function.' " (*Anderson Union High School Dist. v. Shasta Secondary Home School* (2016) 4 Cal.App.5th 262, 278.)

Under Paragraph 2.15(i), eligibility is based on the employee's 50 percent or greater *appointment* to work ("appointed to work 50% time or more").  Eligibility is *not* determined by the number of hours *actually* worked.  The trial court erred in interpreting Paragraph 2.15(i) to mean that Richman is an Eligible Employee in part because he "spent the vast majority of his career working for the university."  That interpretation is possible only by deleting "appointed to work" and rewriting Paragraph 2.15(i) to provide that an eligible employee is one who "works 50% time or more."  The court's role "is to ascertain the meaning of the words used, ' "not to insert what has been omitted" ' or otherwise rewrite the law to conform to an intention that has not been expressed." (*Salawy v. Ocean Towers Housing Corp.* (2004) 121 Cal.App.4th 664, 674.)

The evidence also leaves no room for an interpretation other than Richman received a 100 percent *VA* appointment, not a 100 percent UC appointment.  His UC appointment letter states he will be "salaried 100% time by the Veterans Administration."  This is an eight-eighths VA appointment.  At trial, even Richman acknowledged this was a 100 percent VA appointment:

> "Q:  And your appointment at the VA was 8/8ths[,] correct?
>
> "A:  Yes, 40 hours.
>
> "Q:  And that was a 100 percent appointment[,] right?

18

"A: Yes.

"Q: And that lasted the entire time that you were employed by the university, correct?

"A: Yes.

"Q: And based on this letter, you were informed that you would be, quote, salaried 100 percent time by the Veterans Administration[,] right?" [¶] . . . [¶]

"A: That's what it says, yes.

"Q: And by salaried 100 percent time, you understood that you would be getting a full-time salary from the VA[,] correct?

"A: Yes.

"Q: And that you would be getting a supplemental amount of compensation from the university[,] right?

"A: Yes."

It is true, as Richman points out, that his UC appointment letter also acknowledges an "appointment as Assistant Professor" in the medical school. But whereas the letter noted a 100 percent VA appointment, it states nothing about the percentage of UC appointment, or that Richman would be eligible under the UCRP. Richman's testimony concedes these points:

"Q: Now, the letter doesn't reference any specific percentage appointment at the university, does it?

"A: No.

"Q: And the only percentage appointment that's listed in there is for the VA[,] correct?

"A: Yes. That's a hundred percent time." [¶] . . . [¶]

"Q: And the offer letter that we're looking at, there was no mention of any pension or retirement plan as part of your employment in the letter[,] correct?

"A: No, that was never discussed . . . .

"Q: But it was not in the letter[,] correct?

19

"A: Correct.

"Q: And you never received a document at the time that you were hired that you were deemed eligible for the [UCRP][,] correct?

"A: This is all of the letters that I ever received.

"Q: So the answer is no?

"A: No."

Moreover, before the policy change in 1992, UCSD medical faculty with a joint VA appointment could not have more than a total 100 percent appointment at both institutions. There is no contrary evidence. Ricks testified:

"Q: As part of your job duties, have you come to learn how the university applied the [UCRP] to faculty with joint appointments at the VA?

"A: Yes." [¶] . . . [¶] "Well, prior to 1992, the faculty could only have ratio percentage appointments [totaling] 100 percent between both the VA and the UC positions. . . .

"Q: All right. And with respect to those appointments, if a faculty member had an 8/8ths appointment at the VA prior to 1992, then would they be eligible for the [UCRP]?

"A: They would not.

"Q: And that was because the total percentage appointment could be 100 percent between the university and the VA prior to 1992.

"A: Right."

The inescapable conclusion from the plain words in Paragraph 2.15(i) and Richman's testimony is that starting in 1976 he had a 100 percent VA appointment. Pre-1992, that necessarily means he had a zero percent UC appointment. Therefore, as a matter of law he was not an Eligible Employee

under the UCRP, which requires at least a 50 percent university appointment.

In urging a different conclusion, Richman starts by framing the issue as one invoking the deferential substantial evidence standard of review. He contends "all of the issues raised by the Regents on appeal are challenges to factual determinations." He argues the Regents have either forfeited these issues (by not presenting all the relevant evidence in the opening brief), or if not forfeited, the findings must be affirmed. Specifically with respect to Paragraph 2.15(i), Richman contends the judgment is based on two "factual determinations"—(1) the terms of the 1976 UCRP; and (2) whether Richman's employment was "at least 50 percent of the time at UCSD."

We disagree; neither of these two issues present factual questions. The "terms" of Paragraph 2.15(i) are not disputed. The issue is not what the words are, but what they mean. As noted earlier, this is in effect an issue of statutory interpretation, subject to independent appellate review.

As to the second question—whether his employment was "at least 50 percent of the time at UCSD"—Richman's argument belies a fundamental misunderstanding of Paragraph 2.15(i). The dispositive inquiry under Paragraph 2.15(i) is not whether employment was "at least 50 percent of the time at UCSD." The key, which like the trial court Richman also ignores, is his UC "appointment." The percentage UC appointment is calculated *not* on actual hours worked, but rather in reference to the extent of the VA appointment:

UC appointment = 100 - (percentage of VA Appointment)

In a related argument, Richman asserts that "abundant evidence," including his 1976 university appointment letter and his teaching hours, supports a factual determination that he was an Eligible Employee "effective

21

July 1, 1976." But as Richman conceded at trial, the 1976 appointment letter does not contain any UC percentage appointment. And no one disputes he worked thousands of hours teaching. The problem is that actual hours worked is a distinctly different issue from appointment, and under Paragraph 2.15(i), it is only the appointment that counts.

Richman further points out that he served on the UC Academic Senate and received numerous academic promotions and accolades. But there is no dispute he worked long hours and was a highly valued UC employee. Those facts are just not relevant in determining eligibility as defined in Paragraph 2.15(i).

Richman also contends that even pre-1992, faculty members with joint UC/VA appointments could hold a combined 150 percent appointment. In closing argument, for example, his attorney argued there was a "glitch" that the university needed to and did "fix," and there is "no evidence that any plan was changed." However, the 1992 memorandum announcing the new policy starts by summarizing the then-existing policy: "Historically, their University appointment percentage and their VA appointment percentage would equal 100%. In most cases, the VA appointment was 5/8 time or greater, *by definition making the University appointment 3/8 time. Therefore, many UC/VA joint appointees were not eligible for UCRP membership.*" Going from a maximum combined 100 percent (pre-1992) to a combined maximum 150 percent (post-1992) is a change in policy.

In 1981, the Regents amended Paragraph 2.15 to specifically exclude from eligibility "[a]n employee who receives remuneration under a special compensation plan but who receives no Covered Compensation." Invoking

the so-called "California Rule,"[7] Richman also contends the Regents "may not, under the guise of 'interpreting' the [UCRP], conjure language that is not included and was not inserted until years later."  But even before the 1981 amendment, Richman was not an Eligible Employee under Paragraph 2.15 because he lacked at least a 50 percent university appointment.  After 1981, he may have been ineligible for an *additional* reason—that he received remuneration under the Compensation Plan but received no Covered Compensation.  That there is an alternative basis for determining ineligibility after 1981, however, does not mean the Regents' correct determination based on the pre-1981 version of Paragraph 2.15 is any less valid.  Accordingly, we reject Richman's claim that the Regents "used a 1981-created exclusion to deny Dr. Richman 1976 eligibility in the UCRP."

Perhaps Richman's best argument is that documents in his personnel file show "100% time" next to or near his university titles.  In its statement of decision, the trial court cited these documents to support its conclusion that Richman's university appointment "was a one-hundred percent (100%) appointment."  The following are examples:

---

7      "Under the 'California Rule,' as it has come to be known [(*Cal Fire Local 2881 v. California Public Employees' Retirement System* (2019) 6 Cal.5th 965, 971)], the contract clause of the state Constitution requires any modification of public employee pension plans to satisfy a standard established in a long line of California Supreme Court decisions, including most prominently *Allen v. City of Long Beach* (1955) 45 Cal.2d 128." (*Alameda County Deputy Sheriff's Association v. Alameda County Employees' Retirement Association* (2020) 9 Cal.5th 1032, 1053.)

ACADEMIC RECOMMENDATION SUMMARY FOR: ___ Promotion  X Merit  X Reappointment
___ Above Scale  ___ Appraisal  ___ Recall

FROM: DEPARTMENT ___PATHOLOGY___  COLLEGE ___SCHOOL OF MEDICINE___

NAME ___RICHMAN___  ___Douglas___  ___D.___
Last (in caps)  First  Initial

**Present Status**  **Proposed Status**

Rank & Step ___Asst. Prof. of Pathology in Residence, Step II___  Rank & Step ___Asst. Prof. of Pathology in Residence, Step III___

Salary ___$19,200___  Percent of Time ___100%___  Salary ___$20,200 (VA)___  Percent of Time ___100%___
(VA)

Basis: 9-mo.___  11-mo. X  Basis: 9-mo.___  11-mo. X

Years at Rank ___2___  Step ___2___  Effective Date ___July 1, 1978___

Signature _____  Date ___11/1/77___
K. Benirschke, M.D.
(Department/Division Chairman/Director)

**U. C. Academic Employment:**

| Period | Title | Step | Percent Time | Department |
|---|---|---|---|---|
| 7/1/76 - Present | Assistant Professor of Pathology in Residence | II | 100% | Pathology |

Last (in caps)  First  Initial

**Present Status**  **Proposed Status**

Rank & Step ___Assoc. Prof. in Res. Step II___ (Pathology & Medicine)  Rank & Step ___Associate Prof. in Res. Step III___ (Pathology & Medicine)

Salary ___$39,500___  Percent of Time ___100%___  Salary ___$42,200 (VA)___  Percent of Time ___100%___
(VA)

Basis: 9-mo.___  11-mo. X  Basis: 9-mo.___  11-mo. X

Years at Rank ___4___  Step ___2___  Effective Date ___July 1, 1986___

Signature _____  Date ___10/24/85___
Peter W. Lampert, M.D. (Path.)  Helen M. Ranney, M.D.
(Department/Division Chairman/Director)  (Medicine)

**U. C. Academic Employment:**

| Period | Title | Step | Percent Time | Department |
|---|---|---|---|---|
| 7/1/76-6/30/78 | Asst. Prof. in Res. | II | 100% | Pathology & Medicine (VA) |
| 7/1/78-6/30/80 | Asst. Prof. in Res. | III | " | " " " " |
| 7/1/80-6/30/82 | Asst. Prof. in Res. | IV | " | " " " " |
| 7/1/82-6/30/84 | Assoc. Prof. in Res. | I | " | " " " " |
| 7/1/84-Present | Assoc. Prof. in Res. | II | " | " " " " |
| 8/1/84-7/31/85 | Special Leave of Absence | | | |

VA appointment: Chief Grade 9, 8/8 time @ $66,198

Department Vote, where applicable:  Number of Faculty Eligible to Vote

For several reasons, these documents cannot reasonably be interpreted to mean Richman had a 100 percent UC appointment. The form above states, "VA appointment: Chief Grade 9, *8/8 time*." (Italics added.) That means a 100 percent *VA* appointment. Bailey explained:

24

"Q: Now, according to that document, do you see that next to the salary designations it lists 'VA' in parentheses?

"A: Yes.

"Q: What does that mean?

"A: That means to me that the time that is put there, the 100 percent time, is time at the VA.

"Q: And then under the section called 'UC Academic Employment' in the middle of the page. [¶] Do you see that?

"A: Yes.

"Q: It refers to the various titles that Dr. Richman held during his employment[,] right?

"A: Yes.

"Q: And if you go over to the right-hand column, . . . .

"A: Yes.

"Q: [I]t lists in the department column 'VA' in parentheses[,] right?

"A: Correct.

"Q: Why do you think that's listed there?

"A: Because it means that the time spent was 100 percent at the VA."

Moreover, these documents are not used for payroll. They are "employment history," kept in the Richman's personnel file. Bailey cautioned to not confuse the zero percent UC "appointment" with the distinct issue of hours he actually worked:

"Remember, this is not a payroll document. That is an academic summary page. So it's saying that his appointment is a hundred percent at the VA. It's not saying that he—that he never worked at the university."

25

In a related argument, Richman points to other parts of Bailey's testimony where he stated that the Compensation Plan applies only to faculty having "50 percent or more" UC appointment. Because it is undisputed that Richman was in the Compensation Plan, he contends that means he had at least a 50 percent UC appointment. However, Bailey's testimony on this point is self-contradictory and confusing. In a portion of the reporter's transcript that Richman ignores, Bailey also testified, "I might add that people can be in the plan at *zero percent* time because the plan is governed by title of the faculty. So all faculty titles in Health Sciences are in the plan including Professor in Residence." (Italics added.)

In any event, it is unnecessary to grapple with Bailey's testimony on this point—the Compensation Plan itself is in evidence. Like the UCRP, having been promulgated by the Regents in governing its internal affairs, it has the force and effect of statute. (See *Lachtman v. Regents of University of California* (2007) 158 Cal.App.4th 187, 198 (*Lachtman*) ["the University academic personnel policies controlled the terms of . . . employment and 'have the force and effect of statute.' "].) Parts B and C of the Compensation Plan, entitled Membership and Eligibility respectively, provide that UCSD medical school faculty—like Richman—who had patient care responsibilities at the VA and concurrently held faculty appointments were governed by the Compensation Plan. In the 1972 Compensation Plan applicable here, there is no 50 percent UC appointment criteria.[8]

---

8    In closing argument, the Regents' lawyer intimated that the Compensation Plan was later amended to require a 50 percent UC appointment. There is no evidence of that in the record; but if true, that might explain Bailey's inconsistent testimony on the point. In closing argument, the Regents' lawyer noted, "Bailey didn't give in his testimony what period of time that 50 percent triggered in the plan . . . ."

Last, Richman asserts that the trial court found he "qualified" as an Eligible Employee under "three separate clauses" of Paragraph 2.15(i). While this is true, it does not advance Richman's argument because each of those clauses requires at least a 50 percent university appointment. The first clause requires the 50 percent UC appointment to run "for an indefinite period," the second, "for a definite period of one year or longer," and the third, "for a shorter definite period with the reasonable prospect of renewal or extension."

## Part 2: 1992 through 2019

A. *Additional Factual Background*

Under the UCRP, the amount of service credit accrued each fiscal year is a fraction less than or equal to one. The numerator is the eligible employee's "Covered Compensation." The denominator is his or her "Permissible Compensation:"

> "The amount of Credited Service earned by a Member for any fiscal year shall be equal to the ratio of his Covered Compensation for the fiscal year to his Permissible Compensation for the fiscal year. The maximum amount of Credited Service for any fiscal year shall not exceed one year . . . ."

"Permissible Compensation" is defined as the full-time Covered Compensation for the employee's position:

> "Permissible Compensation means the monthly amount of Covered Compensation which a Member would earn if employed on a full-time basis and if he worked full time."

Assuming the employee is "Eligible" under paragraph 2.15, to determine each year's service credit, one must first determine the employee's Covered Compensation. The larger the Covered Compensation, the larger the fraction and amount of service credit. When Covered Compensation

27

equals or exceeds Permissible Compensation, the employee earns the maximum of one service credit for that fiscal year.

The amount of Richman's "Permissible Compensation" is established by salary scales the court received in evidence. The litigation issue, therefore, is the amount of his "Covered Compensation."

Under the 1976 UCRP, Covered Compensation is defined as:

> "[T]he total monthly remuneration which a Member receives from the University for his regular and normal appointment . . . ."

However, Covered Compensation excludes:

> "Remuneration which exceeds 100% of the salary . . . for the position to which a Member has been appointed . . . ."

Also addressing "Covered Compensation," under the heading, "Retirement Benefits," the Compensation Plan provides:

> "The additional compensation paid in addition to the base salary on the fiscal-year clinical salary scale is not included in "covered compensation" for purposes of establishing regular retirement benefits . . . ." [¶] . . . [¶]

> "The incentive compensation is not included in 'covered compensation' for purposes of establishing regular retirement benefits . . . ."

Based upon these provisions, the university considers Richman's Covered Compensation to consist of X (base salary) as well as its multipliers (X′ and Y′). However, Y (incentive compensation) and Z (additional compensation) are not Covered Compensation.

Richman's payroll documents reflect these distinctions. For example, his 1978–1979 payroll document is copied below:

The notation "Y B/A" indicates he was paid additional compensation (Y) in a negotiated amount. The document also shows "NON SALARIED"; no X compensation is indicated. In sum, the Regents contend Richman was not paid any Covered Compensation that year.

The university determined that Richman received Covered Compensation each year from 1994 to his retirement in 2019. Based on those amounts (as distinguished from gross UC pay, which includes Y and Z income), the university credited him with 14.2177 years of service credit.

In contrast, Richman contends that his gross UC earnings, which include Y and Z income, constitute Covered Compensation. His argument is in two parts. First, he points to the plain language in UCRP's definition of Covered Compensation—"*total monthly remuneration* which a Member receives from the University." Second, he argues that the UCRP *alone*—not the Compensation Plan—governs because the UCRP does not incorporate the Compensation Plan by reference, nor state that in the event of a conflict or ambiguity, " 'which policy prevails.' " Elaborating on this second point, Richman acknowledges that the Compensation Plan narrows the definition of Covered Compensation by excluding Y and Z income. But he
(1) characterizes the Compensation Plan as "*extrinsic evidence*" of the

29

Regents' intent in enacting the UCRP, (2) asserts this "extrinsic evidence" creates ambiguity in what constitutes Covered Compensation under the UCRP, and (3) invokes the rule that extrinsic evidence cannot be used to "create an ambiguity . . . and then us[e] the original extrinsic evidence to construe an ambiguity created in itself." (Italics added in first quote.)

The trial court agreed with Richman's analysis. The court was particularly troubled by the fact that although the UCRP was amended in 1976, it contains "absolutely no reference" to the 1972 Compensation Plan. Because the UCRP itself does not define Covered Compensation in terms of X, Y, and Z components, the court determined that a "conflict" exists between the UCRP and the Compensation Plan. Finding an "inherent ambiguity" resulting from that conflict that "cannot be reconciled," the court essentially threw out the Compensation Plan on the grounds that ambiguities in a pension statute must be resolved in favor of the person seeking the pension. For the same principle, the court also invoked Civil Code section 1654, which states that when interpreting a contract, in cases of uncertainty the language should be interpreted against the party who caused the uncertainty to exist.

B. *The Regents Have Not Forfeited This Issue*

Richman contends the Regents have "waived" any challenge to the amount of service credit the court awarded by failing to specifically object to the proposed statement of decision on this ground. This argument doubly fails. First, no objection to the statement of decision was necessary to preserve the point on appeal. Objections to a proposed statement of decision are appropriate only where it "does not resolve a controverted issue" or is "ambiguous." (Code Civ. Proc., § 634.) Neither is involved here. Second, even if an objection were necessary, the Regents did so. In a filing entitled,

30

"Objections to the Court's Proposed Statement of Decision," the Regents stated:

> "Dr. Richman admitted he included all of his actual earnings for every year in the 'Covered Compensation' column . . . which is not consistent with the University's consistent interpretation that service credit computation concerns base salary compensation."

C. *The Compensation Plan is Not "Extrinsic Evidence"; Properly Construed with the UCRP, Covered Compensation Excludes Y and Z Earnings.*

The fundamental mistake in Richman's argument and the trial court's ruling is they both treat the Compensation Plan as "extrinsic evidence" of the Regents intent in enacting the UCRP, or alternatively as a contract. But the Compensation Plan is not a contract. "Employment by the State of California, including employment by the University of California, is held by statute rather than by contract." (*Lachtman, supra*, 158 Cal.App.4th at p. 198.) Nor is the Compensation Plan "extrinsic evidence" of the Regents' intent with respect to the UCRP. Rather, for the same reasons the UCRP itself is treated as a statute, the Compensation Plan too has the force and effect of statute. This is because the Regents "have rulemaking and policymaking power in regard to the University; their policies and procedures have the force and effect of statute." (*Kim v. Regents of University of California* (2000) 80 Cal.App.4th 160, 165.)

Accordingly, in considering how the UCRP interacts with the Compensation Plan, familiar rules of statutory interpretation apply. Statutes governing a single subject " 'must be read together and so construed as to give effect, when possible, to all the provisions thereof.' " (*Turner v. Association of American Medical Colleges* (2011) 193 Cal.App.4th 1047, 1056.) Statutes " 'should be interpreted in such a way as to make them consistent with each other, rather than obviate one another.' " (*City of Martinez v.*

31

*Workers' Comp. Appeals Bd.* (2000) 85 Cal.App.4th 601, 616.) And "[p]otentially conflicting statutes must be harmonized whenever possible." (*Department of Fair Employment and Housing v. Superior Court* (2020) 54 Cal.App.5th 356, 384.)

Thus, instead of declaring an "irreconcilable conflict" between the UCRP and the Compensation Plan and resolving it by throwing out the Compensation Plan, the trial court was required to harmonize them if at all possible. In doing so, it is important to note that the UCRP is a *generally applicable* retirement program. It applies statewide, to all UC employees—not just to UCSD medical school faculty. Thus, it is hardly surprising that the UCRP does not define "Covered Compensation" with terms like X, Y, and Z, which are terms specific to physician faculty.

Viewing the UCRP and Compensation Plans as complimentary rather than antagonistic—with the UCRP providing general rules, and the Compensation Plan having specific application to UCSD medical school faculty—the proper interpretation is relatively simple. "[S]pecific provisions take precedence over more general ones." (*Stoetzl v. Department of Human Resources* (2019) 7 Cal.5th 718, 748.) And if conflicting statutes cannot be reconciled, " 'more specific provisions take precedence over more general ones.' " (*Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 634.)

The UCRP excludes from covered compensation "Remuneration which exceeds 100% of the salary . . . for the position to which a Member has been appointed . . . ." The UC salary scales—that is, "Permissible Compensation"—are base salary. They do not include incentive or additional compensation. The Compensation Plan provides that "additional compensation in addition to the base salary . . . is not included in 'covered compensation' for purposes of establishing regular retirement benefits."

32

Read together with the goal of harmonizing the provisions, and with the specific governing the general, the only reasonable conclusion is that Richman's Y and Z compensation "exceeds 100% of the [base] salary" for his appointed UC position and, therefore, "is not included in 'Covered Compensation.'"

It is, therefore, unnecessary to consider doctrines that would resolve ambiguous retirement provisions in favor of the pensioner. There is no ambiguity. But even if there were some doubt, the trial court's reliance on Civil Code section 1654 was misplaced. Neither the UCRP nor the Compensation Plan is a contract. Nor was it appropriate to rely on the rule that pension statutes are generally construed in favor of the person seeking the pension. (See, e.g., *San Francisco Fire Fighters v. Retirement Board* (1983) 143 Cal.App.3d 604, 609.) The purpose of that rule is to effectuate the presumed legislative intent to favor the pensioner. (*Overend v. Board of Administration* (1991) 232 Cal.App.3d 166, 171.) Here, however, it is unnecessary to presume the intent of the legislative body. The Regents has clearly expressed its intent that Y and Z income is not Covered Compensation. Where "the reason of a rule ceases, so should the rule itself." (Civ. Code, § 3510.)[9]

---

[9] In an unopposed request for judicial notice, Richman asks we judicially notice 46 pages of the prior 1971 version of the UCRP. Without analysis, he contends this document "helps to explain and interpret" the 1976 UCRP. He also requests judicial notice of eight other documents that he contends show that the Regents "did not collect employee or employer contributions" from November 1990 through April 2010. The request for judicial notice is denied because the documents are not relevant to disposition of this appeal. (*Unzueta v. Akopyan* (2019) 42 Cal.App.5th 199, 221, fn. 13.)

## D. *Reversal with Directions is the Appropriate Disposition*

Richman's theory at trial was that the Covered Compensation can only be interpreted to mean his total or gross UC pay, as evidenced by his W-2's and in some cases his UC payroll record of gross pay. He testified that his service credits should have been calculated based on "the income received from the university" and for the period 2007 to 2017, which was based on his W-2 amounts of gross pay. Richman claimed it was impossible for him to segregate his Y and Z income from X, X′ and Y′ earnings based on documents he "could get from the university."

We are frankly at a loss to understand how Richman can fairly claim that university payroll records do not distinguish his Covered Compensation for retirement purposes from gross pay. One is right above the other:

```
5154   HR BEN ELIG NOV            88.01      5155   H
5501   TOTAL GROSS YTD        246,189.12     5502   P
5505   RETR GROSS YTD         151,545.78     5506   S
5510   MEDICR GRS YTD         245,073.12     5513   C
5521   1MO OLD RTR GRS         12,920.82     5522   2
```

Even a person not versed in payroll parlance could reasonably infer that RETR has something to do with retirement. Consistent with this commonsense interpretation, Kathryn Brumfield, a UCSD payroll department supervisor, testified that "for retirement purposes in the UCRP, the $151,545 figure would be used as opposed to the $246,189 figure for covered compensation."

On cross-examination, the Regents' lawyer showed Richman this payroll document:

```
5501   TOTAL GROSS YTD       172,435.26     5502   FWT GR
5505   RETR GROSS YTD        132,661.30     5506   SWT GR
5510   MEDICR GRS YTD        171,415.26     5511   1MTH D
```

Richman testified he used "the total gross YTD figure" of $172,435.26 in calculating the service credits he claims and asserted, somewhat incredibly,

34

that he had "*no idea*" what "RETR GROSS YTD" represents. (Italics added in second quote.)

The trial court completely adopted Richman's argument that his service credits should have been calculated based on his gross UC pay constituting his Covered Compensation. The court incorporated Richman's calculations into the statement of decision and judgment. In so doing, the court erred because, as a matter of law, Richman's Covered Compensation under the UCRP and the Compensation Plan is not the same as his gross UC pay. In short, Richman was required to establish service credits based on this formula:

$$(\text{Covered Compensation}) \div (\text{Permissible Compensation})$$

But instead he proved something else:

$$(\text{Gross Compensation}) \div (\text{Permissible Compensation})$$

In the opening brief, the Regents ask us to reverse the judgment with directions to enter judgment in their favor, or "at a minimum" remand with directions to recalculate the service credit owed. Richman's brief does not address the disposition, except to urge that the judgment be "affirmed in full."

When the plaintiff has had full and fair opportunity to present the case, and the evidence is insufficient as a matter of law to support the judgment, a judgment for defendant is required and no new trial is ordinarily allowed, unless there is newly discovered evidence of the type that would have justified the grant of a motion for new trial. (*Cardinal Health 301, Inc. v. Tyco Electronics Corp.* (2008) 169 Cal.App.4th 116, 153–154; see also *Acqua Vista Homeowners Association v. MWI, Inc.* (2017) 7 Cal.App.5th 1129.) Here, Richman had a full and fair opportunity to litigate his claimed service credits. Payroll records in evidence contain this information. And that could

not have come as any surprise.  Five months before trial, his attorney deposed the payroll department supervisor who so testified.

Moreover, although the record indicates that some payroll information over the course of 42 years was missing, Richman testified that he ultimately obtained record of earnings for all years except part of 1984.  And Ricks testified that the university sent Richman retirement account statements spanning the period 1980 through 2018.

For obvious tactical reasons, Richman tried the case on the theory that his gross UC pay constituted Covered Compensation.  Since we have concluded that theory fails as a matter of law and Richman had a full and fair opportunity to try the case on the correct legal basis, retrial on a different theory is unwarranted.  This disposition makes it unnecessary to consider the Regents' claims that the action is time-barred, and we express no opinion on those issues.

## DISPOSITION

The judgment is reversed with directions to enter a new judgment in favor of the Regents.  The Regents are entitled to costs on appeal.


DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


IRION, J.


36